UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SUZANNE HUCK,

        Plaintiff,                                   Case No. 2:06-cv-1088
                                                              JUDGE GREGORY L. FROST
     v.                                           Magistrate Judge Norah McCann King

JIM BELKNAP, et al.,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court for consideration of a motion for summary judgment (Doc. # 59) filed by Defendants, a memorandum in opposition (Doc. # 63) filed by Plaintiff, and a reply memorandum (Doc. # 64) filed by Defendants. For the reasons that follow, this Court finds the motion well taken only in part.

**I.  Background**

Plaintiff, Suzanne L. Huck, is a veterinary technician employed by the College of Veterinary Medicine at The Ohio State University, a defendant in this action. Huck began working for the college in 1996 as a veterinary technician, and in 1999 she became the Equine Technician Supervisor responsible for supervising approximately a dozen technicians. Until late in 2005, Huck had received favorable job evaluations and annual raises with no record of discipline.

Two series of events form the basis of Huck's lawsuit. She first asserts that on September 12, 2005, while performing her duties of creating and maintaining the surgery

1

schedule of all the equine surgeons, she noticed a scheduling conflict. Both Defendant Jim Belknap, the then-acting chief for the Equine Section of the College, and another surgeon, Alicia Bertone, were going to be performing surgeries that presented a potential of overlapping equipment use. Huck contacted Belknap, who directed her to resolve the conflict by speaking with Bertone. She then contacted Bertone, who in turn spoke with Belknap, and after some disagreement the surgeons resolved that Bertone's operation would take precedence. Following this resolution, Huck spoke with Belknap on the telephone. He allegedly yelled at her using profane language, calling her an "ass" and stating that he "should be an ass" so that she "would maybe do [her] job for him better." (Doc. # 56, Huck Dep., at 30.) Belknap also purportedly told Huck that she was a poor technician.

Huck complained to her supervisor, Dr. Richard Bednarski, an associate professor and the then-director of the Veterinary Hospital, about the alleged gender-based discriminatory treatment she had received.

In a separate, second incident, Huck maintains that one of the equine surgery technicians at the College, Kristen Benson, was sexually harassed on October 5, 2005, by Katie Smith, a resident doctor at the Galbreath Equine Center. According to Benson–who was eight months pregnant at the time–when she walked into the radiology suite at the Center, Smith allegedly looked at her and said, "Hey, Brood Mare, does your man like to suck the milk out of your titties?" (Doc. # 63-8.) Benson asserts that she responded in the negative and looked away as Smith turned to a student present and asked him, "Would you suck the breast milk out of your woman's titties?" (*Id.*) After he responded that the subject had never come up, Smith allegedly presented her graphic opinion about sexual experiences with her own breasts.

Benson consulted Huck about the incident. Huck had also complained to Bednarski and human resources about other conduct by Smith, and Huck advised Benson to pursue a formal complaint of sexual harassment against Smith. Benson did in fact file a complaint with the College against Smith, pursuant to OSU's sexual harassment policy. In response, Bednarski and Lynn Lemaster, the head of Human Resources, allegedly cautioned Huck and Benson that pursuit of the complaint could lead to other investigations being conducted, which could result in discipline against them. Huck asserts that her own supervisors then in fact engaged in a series of retaliatory acts against her for her having advised Benson.

The first alleged act of retaliation was the result of an investigation by OSU human resources personnel involving e-mails of a sexual nature sent on the school system. During an interview with Smith about her comments to Benson, Smith informed human resources that Huck and Benson had sent sexually oriented emails of such things as a vagina smoking a cigar. Huck had never reported receipt of such emails from Benson, allegedly because she considered them commonplace and because she "had no reason to believe that anyone receiving them were in any way offended by them," which she believed exempted her form the College's reporting policy. (Doc. # 63-4, Huck Decl. ¶ 12.) The investigator also found that in addition to a failure to report receiving the emails, Huck admitted to having sent three emails of a sexual nature herself; however, the investigator failed to write this purported admission down in her interview notes. The human resources official in charge of the investigation concluded that the emails were of an inappropriate nature and recommended a five-day suspension without pay for Huck, a determination that she appealed, asserting retaliation, on February 24, 2006.

This led to the next act of alleged retaliation, which occurred on March 23, 2006, when Defendant Tom Rosol, the dean, reassigned Huck to a non-supervisory technician position in the Small Animal and Operative Practices Divisions, which is outside of the College's Equine Section. She asserts that she was "not told a reason for the involuntary reassignment other than Dr. Bednarski having warned me that 'they' wanted to get rid of me." (Doc. # 63-4, Huck Decl. ¶ 16.) The College, which explains the transfer as a performance-related reassignment, notes that Huck had previously applied for the job.

Two notable pieces of evidence relate to this involuntary reassignment. First, during the deposition of the human resources employee who conducted the email investigation, Julie McDonald, McDonald conceded that Huck's appeal was "a consideration in taking a job action" against Huck. (Doc. # 54-5, McDonald Dep., at 28.) Second, McDonald's notes of a meeting regarding Huck's transfer include a list of unanswered questions culminating in the statement "what we do know–appeal on file" which McDonald stated "could be" a reference to Huck's appeal of her suspension. (Doc. # 54-5, McDonald Dep., at 27.)

The third act of alleged retaliation was when Huck received an October 6, 2006 letter from Bednarski that indicated that the college had completed its annual review of salaries and that Huck would receive a 3.01% pay increase. (Doc. # 63-6.) Huck claims that raises are tied to performance and that because she received a lesser raise than other technicians with worse performance evaluations, her increase was punitive. Defendants dispute this contention and point to evidence suggesting that Huck fell within the mid-range of raise percentages while still making considerably more than other technicians. Huck also asserts that she has been frequently

4

told to be "careful" and that "the 'walls have ears' " and that she is often watched and followed while at work while other employees are not. (Doc. # 63-4, Huck Decl. ¶ 19.)

After receiving a right-to-sue letter, Huck filed the instant action on December 29, 2006, against Defendants Belknap and Rosol in their official and individual capacities, as well as against the College and its then-president, Karen Holbrook, in her official capacity only. The complaint claims under Title VII, 42 U.S.C. § 2000e *et seq.*, and Ohio anti-discrimination laws, 42 Ohio Rev.Code § 4112 *et seq.*, alleging employment discrimination on the basis of gender and retaliation for engaging in a statutorily protected activity, specifically, the counsel she provided Benson about pursuing Benson's sexual harassment complaint. This Court previously granted judgment on the pleadings for Defendants on the Title VII claims against Defendants in their individual capacities and the state law claims. (Doc. # 24.) Defendants then moved for summary judgment on all the remaining claims. (Doc. # 59.) The parties have completed briefing on the summary judgment motion, which is now ripe for disposition.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

**B. Analysis**

As noted, Huck asserts a claim for sex discrimination. Such a claim falls under Title VII, which provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Accordingly, Huck must establish a *prima facie* case by demonstrating that "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male . . . employees for the same or similar conduct." *Martin v. General Elec. Co.*, 187 F. App'x 553, 558-59(6th Cir. 2006).

Huck also asserts discrimination in the form of a hostile work environment. To prove this claim, Huck must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23 (1993)) (internal quotes and citations omitted).

Finally, Huck's last claim is for retaliation. In order to establish a *prima facie* case of retaliation, a plaintiff must prove that

> (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action..

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 344 (6th Cir. 2008) (citing *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000)). The Sixth Circuit has explained that the burden of establishing such a *prima facie* case is easily met. *Schramm v. Slater*, 105 F. App'x 34, 41 (6th Cir. 2004).

Cognizant of these standards, the Court agrees with Defendants that Huck has failed to present a *prima facie* case of gender discrimination based on her failure to point to similarly situated male employees who were treated better. Huck has testified that Belknap treated her, Bertone, and Benson poorly because they are females, while he does not treat any males in the same way. She has also pointed to the heightened discipline she received. But as Defendants correctly note, she fails to point to similarly situated–i.e., comparable in relevant aspects–male

employees. In fact, as Defendants assert in their reply memorandum (Doc. # 64), Huck's memorandum in opposition (Doc. # 63) focuses on her retaliation claim and does not even attempt to support her discrimination claim.

Similarly, Huck opts to also leave her hostile work environment claim undefended in her memorandum in opposition, which, as noted, focuses on retaliation. Her decision does not mean that Defendants are invariably entitled to summary judgment. Huck has presented evidence (necessarily construed in a light most favorable to her) that the workplace was permeated with intimidation, ridicule, and insult. Incidents with Smith in particular apparently served to create an unpleasant workplace. In addition to creating discomfort by talking about her breasts, the less than shy resident doctor apparently liked to discuss her sexual activities by telling Huck and others during rounds, for example, that "she liked to have her cervix rammed." (Doc. # 56, Huck Dep., at 94.) Huck has also presented circumstantial evidence that Defendants fostered this environment by discouraging reporting and by failing to address or addressing insufficiently the incidents. Such incidents, if true, are sufficiently severe or pervasive so as to alter the conditions of Huck's employment and create an abusive working environment. Huck's workplace is a veterinary facility and a school, not the Playboy Mansion grotto.

The Sixth Circuit has stated that "[t]he act of discrimination by the employer in [a hostile work environment case] is not the harassment, but rather the inappropriate response to the charges of harassment." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005). Thus, "when the allegations of sexual harassment involve a coworker and the employer has fashioned a response, the employer will only be liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.' " *Id. See also*

8

*Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 119 (6th Cir. 2003) ("If the harasser was merely the plaintiff's co-worker, the employer will be liable only where the plaintiff can demonstrate that the employer knew or should have known of the harassment and failed to take appropriate remedial action." (citing *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001))); *Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 564-65 (6th Cir. 2000)).

Defendants attempt to obtain summary judgment by arguing that the harassment of which Huck complains was not severe and pervasive enough and that the College reacted appropriately to those complaints of harassment about which it knew. What this argument overlooks is that although there was discipline dispensed to some of the actors involved in these incidents, individuals such as Huck were allegedly discouraged from pursuing harassment complaints and, as discussed below, individuals such as Smith felt that their complaints were largely ignored.

Defendants cannot attempt to quell complaints by permitting or fostering an atmosphere that discourages them, or by establishing a culture that punishes a complainant, and then seek to reward or vindicate their conduct when a complainant persists and the College has handed down some discipline begrudgingly. The Sixth Circuit has recently emphasized that an employer "faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment. The failure to do so suggests indifference and permissiveness on the part of management." *Hawkins*, 517 F.3d at 344. Discouraging is not remedying. There is thus a genuine issue of material fact here whether Defendants provided a reasonable remedy under the circumstances of this case. This factual dispute prevents summary judgment on the hostile work environment claim, despite Huck's dearth of clear argument in defense of the claim.

This leaves Huck's retaliation claim.  There is similarly no question here that Huck satisfies the first two prongs of the requisite inquiry for retaliation–that she engaged in activity protected by Title VII and that Defendants knew of this activity.  *See Driggers v. City of Owensboro*, 110 F. App'x 499, 510 n.4 (6th Cir. 2004) (treating *both* EEO complaints *and* an oral complaint to a supervisor of discrimination as satisfying protected activity element of a retaliation claim); *Curtis v. Hanger Prosthetics & Orthotics, Inc.*, 101 F. App'x 61, 65 (6th Cir. 2004) (holding that complaint to employer satisfied first two prongs of test); *Delisle v. Brimfield Tp. Police Dep't*, 94 F. App'x 247, 255 (6th Cir. 2004) (treating informal complaint of discrimination as one instance of protected activity).

The parties disagree whether adverse employment actions against Huck exist.  The Sixth Circuit has explained:

> the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace.  *See Burlington Northern,* 126 S.Ct. at 2412-14.  The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2415 (internal quotation marks omitted).

*Hawkins*, 517 F.3d at 345.  Despite Defendants' arguments to the contrary, an involuntary transfer from a supervisory position to a non-supervisory position, a less-than regular raise, and a suspension could indeed dissuade a reasonable worker from making or supporting a charge of discrimination and could indeed affect the terms, conditions, and status of employment.  The fact that Huck once applied for the job to which she was transferred does not as a matter of law mean that she wanted it at the time of her involuntary transfer and that it cannot be a materially adverse action.

This leaves the fourth prong of this Court's retaliation inquiry: that a causal connection exists between the protected activity and the adverse employment action or harassment. The Sixth Circuit has explained that "[t]o establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

Necessarily construing the facts in Huck's favor, the Court recognizes that a reasonable inference can be drawn from the fact that the e-mail investigation and its consequent discipline occurred soon after Huck's complaint about gender discrimination by Belknap and her support of Benson filing a harassment complaint. Similarly, Huck's reassignment occurred soon after her filing of her appeal. Although such temporal proximity is not itself dispositive, it is nonetheless a significant enough factor to be considered as indirect evidence of a connection. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise"). *See also Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). The Court weighs such consideration, however, in light of the Sixth Circuit's qualification that "evidence that harassment occurred soon after a plaintiff engaged in a protected activity is not sufficient to establish a causal link, absent other evidence of a retaliatory motive." *Schramm*, 105 F. App'x at 42 (citing *Nguyen*, 229 F.3d at 566, 557). Here, the temporal proximity of the events coupled with the evidence discussed below present a genuine issue of material fact to be resolved by the jury as to the causal connection between Huck's

11

protected activities and the adverse employment actions she received. *See Curtis*, 101 F. App'x at 65 (finding temporal proximity coupled with reasonable inference supported finding a causal connection).

The Court also notes that Defendants posit that no causal connection can arise from Huck's support of Benson or her filing of an appeal because Huck's reassignment was the result of a decision by Rosol based on an external "leadership team," all of whom were allegedly oblivious to these incidents. In regard to the performance issues learned in part from interviews with the technicians Huck supervised at the time, however, the Court notes Huck's deposition testimony that technicians "Brandi Maxie, Kristen Benson, [and] Barb Sohayda" told her that the interview questions posed to them "were leading, or attempting to lead the technicians into saying not favorable things." (Doc. # 56, Huck Dep., at 103.) A potentially tainted interview producing a tainted report does not, coupled with the temporal proximity of the events, provide the safe harbor Defendants seek.

Once a plaintiff meets the initial burden of establishing a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to present a legitimate non-discriminatory reason why the plaintiff suffered an adverse employment action. *See Martin*, 187 F. App'x at 559; *Hagan v. Warner/Elecktra/Atlantic Corp.*, 92 F. App'x 264, 267 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). After the defendant has met his burden of production, the plaintiff now has the burden to demonstrate that the reason offered by the defense was pretexual. *Martin*, 187 F. App'x at 559; *Hagan*, 92 F. App'x at 267. Here, Defendants assert that Huck was suspended because of her involvement with pornographic e-mails in contravention of College policy, that she was reassigned as part of a reorganization

12

due to performance issues including her showing favoritism and her having problems acting as a supervisor, and that she received the raise she did because of performance considerations coupled with her salary being higher than other technicians.

In order to demonstrate that any of Defendants' proffered reasons are pretexual, Huck must demonstrate that (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse employment decision, or (3) the proffered reason was insufficient to motivate the adverse employment action.  *Koval v. Dow Jones & Co.*, 86 F. App'x 61, 66 (6th Cir. 2004) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)).  She "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083.  In other words, Huck must offer evidence that "circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* at 1084.

Material issues of fact are abundant in this case that directly target the issue of pretext. Necessarily viewing the facts as recounted above in a light most favorable to Huck, this Court can only conclude that it cannot grant summary judgment for Defendants.

The timing of the adverse employment actions imposed on Huck does not by itself demonstrate pretext.  But issues as to Defendants' motives and the sufficiency of their reasons arise when the context within which these decisions occurred is considered.  Management appeared to caution Huck against pursuing complaints.  The conduct and statements of her supervisor and human resources suggest that pursuit of complaints resulted in adverse responses, and opposition to those responses (*i.e.*, Huck's appeal) was apparently a factor influencing the decisionmaking behind still other adverse actions (*i.e.*, Huck's reassignment).  To the extent that

Defendants posit that the reassignment was the result of performance issues learned in part from interviews with the technicians Huck supervised at the time, the Court again notes Huck's deposition testimony that technicians had told her that the interview questions posed to them were slanted so as to produce a poor evaluation. (Doc. # 56, Huck Dep., at 103.)  If the investigation producing Huck's performance evaluation was so tainted, then it was hardly a thorough investigation leading to an honest belief behind Huck's adverse job action.

All of this occurred within an environment filled with multiple actors complaining that they were discriminated against due to their gender and that College management was not acting to address and resolve the discriminatory culture.  Additionally, there is a question as to whether the College e-mail policy indeed permitted the suspension of Huck when neither she nor the recipients of her e-mails were offended by the racy content, which possibly means that there was no duty to report and that the resulting suspension was in fact retaliatory.

These facts, as well as the record as a whole–a record replete with other incidents of sexually oriented comments, sexually oriented emails, and even possible sexual activity in the offices (the record is not wholly clear on this last point, as it may reflect one or more images of oral sex contained on an office computer or oral sex occurring in the office)–presents a workplace that, if these incidents are indeed accurate, can easily be viewed as a hostile work environment in which retaliation governed.

The investigation surrounding Katie Smith perhaps offers the most direct explanation for the environment.  Smith explained that she reluctantly acted as she did, discussing her breasts, others' breasts, and sex in an effort to fit into the workplace culture, a culture that she also perceived as favoring men and as punishing those who rejected the less than professional norms

that apparently pervaded this unusual workplace.  In a November 1, 2005 email to human resources' McDonald, for example, Smith states in part:

> Further, I do not feel as though Lynn [Lemaster of human resources] is taking seriously my complaints about Dr. Robertson with subsequent inactivity, and even denial, by our section head.  My reservations that this is being followed up on are based on the multiple complaints that Dana Beck made during her employment to Lynn Lemaster, Sue Huck, Dr. Reed and even Dr. Bednarski, regarding the improper conduct (pornographic talk and pictures in treadmill room computer, alcohol etc) of Benson and Huck.
>
> I acknowledge and regret I lowered my standards of behaviour [*sic*] to fit into the environment and gain acceptance.  I can guarantee this has not been and will not be repeated – however, this has resulted in my isolation in a hostile work environment and I doubt if anyone else is willing to speak up.

(Doc. # 54-21.)  Thus, Smith describes a workplace in which the culture had degraded to the point where the assertion of professionalism was discouraged or outright punished.

Given the breadth of the various allegations of misconduct described here as well as those set forth in the totality of the record, it is surprising to the Court that those who worked at the College apparently still found at least some time to actually provide care for the animals. Arguably, there is perhaps no more telling a summation of the College's apparent environment during the period in question than the reported regular comment by James Robertson, Smith's former supervisor, whom Smith states liked to address the issue of hospital morale by stating, " 'F*** collegiality.' "[1] (Doc. # 54-14, at 3.)

A jury could therefore conclude that the adverse actions taken against Huck constitute retaliation and that a hostile work environment existed.  The context and timing of the actions

---

[1] The record reflects that during and after the relevant time period, the College has apparently taken steps to address the problematic management and culture issues that existed.

15

and the issues of fact make a reasonable conclusion of pretext possible and must therefore defeat summary judgment here in regard to these claims.

Even those areas of lesser dispute, such as Huck's raise, fall into this analysis. For example, the motivation behind and context surrounding Huck's salary increase are in debate. College of Veterinary Medicine Human Resources Director Kristi Jo Pyke states in an affidavit that "[s]alary raises are based on performance and equity considerations such as an employee's salary compared to the salaries of other comparable positions" (Doc. # 59-8, Pyke Aff. ¶ 3), but she also states in an earlier e-mail concerning a raise given to Benson:

> The other issue regarding this is how important does performance evaluations and feedback play in the process for salary planning. The Provost's guidelines are very clear that salary increases be tied directly to performance. We do the University no good to provide any increase to less than stellar individuals. If managers and supervisors are communicating to their staff that their annual increases are based upon performance, then it is important to support those managers in order to maintain trust.

(Doc. # 63-2, at 1.) The failure to mention in the e-mail anything concerning equity raises highlights a factual issue as to whether "equity considerations"–i.e., pay parity–actually inform salary decisions or whether Defendants are simply attempting to rehabilitate the limited e-mail via the broader affidavit. Moreover, as seen in the meeting notes of McDonald, the evaluation of Huck's performance has included consideration of her having filed an appeal of action taken against her. Thus, even a "performance-only" approach can be regarded as tainted by one or more biasing factors apparently used in evaluating performance.

It must be noted that Smith attributes a considerable amount of the workplace degradation to Huck. At the same time, however, the Court must recognize that credibility issues may exist. Smith apparently sought to mitigate her conduct by painting it, correctly or

not, as a partial response to the conduct of Huck and Benson. But the record also indicates that Smith's conduct reportedly prompted the Huck-assisted Benson to call the police because Benson felt physically threatened by the resident doctor.

  A factfinder could reasonably conclude based on the alleged facts that when Huck, who apparently was both a participant in the workplace culture as well as one of its alleged victims, voiced her own complaints and assisted Benson with her complaint, there was adverse action taken against her. A jury could also conclude that the culture of the workplace discouraged and discriminated against employees who complained. There may be no clean hands here, but it is for the finder of fact to decide whether Huck was a victim of the workplace problems, one who helped create the problems, or both. The foregoing genuine issues of material fact preclude summary judgment.

### III.  Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  (Doc. # 59.)  Huck's hostile work environment claim and retaliation claim remain pending.

**IT IS SO ORDERED**.

                                         /s/ Gregory L. Frost
                                        GREGORY L. FROST
                                        UNITED STATES DISTRICT JUDGE